**Sean P. Ray, OSB No. 075040**
sray@barran.com
**Andrew M. Narus, OSB No. 134373**
anarus@barran.com
Barran Liebman LLP
601 SW Second Avenue
Suite 2300
Portland, Oregon 97204-3159
Telephone: (503) 228-0500
Facsimile No.: (503) 274-1212
Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| ARTHUR WAYNE WALKER, an individual, | Case No. 3:17-cv-01159-AC |
| Plaintiff, | |
| v. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| B & B PRINT SOURCE, INC. a/b/n of PRINT SOURCE, INC. an Oregon Domestic business corporation, | **REQUEST FOR ORAL ARGUMENT** |
| Defendant. | |

## LOCAL RULE 7-1 CERTIFICATION

Andrew Narus, counsel for defendant B & B Print Source, Inc. a/b/n of Print Source, Inc., certifies that he has conferred with plaintiff's counsel regarding this motion for summary judgment and the parties have been unable to resolve the subject matter of this motion.

/ / /

/ / /

Page 1 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## MOTION

Pursuant to Fed. R. Civ. P. 56, defendant B & B Print Source, Inc. a/b/n of Print Source, Inc. ("defendant" or "B&B Print") moves for summary judgment on both claims brought by plaintiff Arthur Wayne Walker ("plaintiff" or "Walker") against it. B&B relies upon the following points and authorities, and the statements, exhibits ("Ex.") and transcripts (Tr.") identified in the declarations of Andrew M. Narus and Tracey Henderson.

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff worked at B&B Print Source in the bindery department for over nine years and was the supervisor of that department throughout his time there. As the Bindery Supervisor, he was designated an exempt employee and paid an annual salary. At the time of his termination, his salary was equivalent to an hourly wage of $42.00 per hour and, in the year before his termination, he received annual compensation far exceeding other employees in the bindery department.

Plaintiff now raises claims for wage and hour violations, including overtime compensation violations, under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207, 216(b), et al. He also asserts claims for wage and hour violations, including overtime compensation and failure to timely pay wages due and owing upon termination of employment violations, under state law, ORS 652.140, ORS 652.150, ORS 653.261.

### II.    STANDARDS GOVERNING SUMMARY JUDGMENT MOTIONS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

Page 2 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The materiality of a fact is determined by the substantive law on the issue. *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The genuineness of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party viewed through the prism of the substantive evidentiary burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid a ruling in defendant's favor on this motion, plaintiff must go beyond the pleadings and identify facts which show a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986). On the admitted and undisputed facts, defendant is entitled to dismissal of plaintiff's claims. As the Ninth Circuit has stated, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimum prima facie case." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994).

### III.    STATEMENT OF FACTS

**A.    Plaintiff's Previous Work Experience and Start of His Employment at B & B Print**

Plaintiff began working for B&B Print on April 2, 2007. Plaintiff had previously worked as a bindery foreman at Precision Graphics for over 20 years and earned a wage of $35 per hour. Narus Decl., Ex. 1 (Walker Depo, 14:5-20). He indicated on his employment application that, as foreman at Precision Graphics, he "did everything." Narus Decl. Ex. 4, p. 1. When he began working at B&B Print, he was paid $24 per hour. Narus Decl. Ex. 4, p. 5. When asked to explain the significant pay cut from Precision Graphics to B&B Print, plaintiff stated that he wanted to work at B&B Print with his "buddy," Steve Wilson, and that the person who hired him, Jim

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Bailey, had promised him higher wages moving forward.

> A: I knew I would make more money.
>
> Q: What do you mean by that?
>
> A: Well, Jim actually said when I was in his office, he said, "You know, you do good" – in the beginning it was going to be a percentage of whatever I could save them.
>
> Because they used to send out all their bindery. And by me coming in to help keep more of that in-house, he was going to give me a percentage of – like, a 5 to 10 percent cut on whatever we had. But that never came to fruition or whatever.

Narus Decl., Ex. 1 (Walker Depo. 33:14-24). In short, plaintiff acknowledges that his compensation was tied to the performance of the bindery department, which he was hired to manage with the intention of increasing the capacities of that department. On August 9, 2007, Jim Bailey completed and faxed an Employment Verification form concerning plaintiff's employment with B&B Print; Mr. Bailey indicated that plaintiff was employed as a "Bindery Manager." Henderson Decl., Ex. 1. Around the same time, plaintiff had a hearing before an administrative law judge regarding his child support obligations. The record indicates that plaintiff appeared for that hearing. The ALJ found as fact that plaintiff "works for B&B Print Source as a Bindery Supervisor and earns $4,000 per month." Henderson Decl., Ex. 2. There is no record of any objection to that finding.

**B.      Plaintiff's Work and Salary at B&B Print Source**

Plaintiff had nearly complete authority over the operation of the bindery department. Although Michelle Lazoff, the Production Scheduler, would coordinate with plaintiff regarding the production schedule and communication with other departments at B&B Print, plaintiff was responsible for and routinely directed the employees in the bindery department how and in what

Page 4 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

order to perform tasks. Henderson Decl., ¶ 5. In determining his oversight of the bindery department, plaintiff was responsible for supervising approximately 8 to 10 employees at any given time.

Consistent with his oversight of and responsibility for the operations of the bindery department, plaintiff was richly compensated for his work. In 2015, plaintiff earned $91,332.50, which included 20 days of vacation and two weeks of holiday pay. T. Henderson Decl., Ex. 3. Plaintiff's compensation far exceeded that of Steve Wilson, who plaintiff contends was a co-manager of the bindery department. At the time plaintiff left employment with B&B Print, Mr. Wilson earned $22.50 per hour and was considered a nonexempt hourly employee. Henderson Decl., ¶ 7. In fact, only seven individual's at B&B Print—none in the bindery department—earned more money than plaintiff: the President of B&B Print, the General Manager, the Controller, three Sales Representatives (who work on commission), and an IT Technician. *Id.*

Plaintiff often informally hired (or recommended for hire) employees in the bindery department, many of them his own family members and friends. Although Human Resources finalized the paperwork for those hires, plaintiff was the individual who initially brought them in to work in the bindery. His wife, Marcy Walker, worked in the bindery for five or six years. Narus Decl., Ex. 3, 12:24-25. With respect to the start of her employment, Ms. Walker explained that there was no job posting for the services she provided to B&B Print, that her husband told her that B&B Print required extra help, and that she communicated with him regarding her availability for shifts. Ms. Walker also provided a summary of the family members who were hired at plaintiff's recommendation. She acknowledged that plaintiff could recommend people for employment within the bindery department, that some of the people he recommended were

Page 5 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

hired, that she is unaware of anyone plaintiff recommended for hire that was not hired, and that herself, Kevin Walker, Jeremy Walker, Chrystal Walker, and Casey Pearson were all recommended by plaintiff and worked at B&B Print. Narus Decl., Ex. 3, 25:2-26:6. Plaintiff also acknowledged that he had participated in at least one employee interview and recommended her hire. Narus Decl. Ex. 1, 24:10-13.

Plaintiff also authorized vacation requests for employees under his supervision. He authorized vacation days for Steve Wilson (who he contends was a "co-manager"), Kevin Walker, Scott Weyer, John Wilson, Scott Spiering, and Michael Hamilton, among others by signing the line marked "Manager's Signature," and indicating that the vacation request was "approved." Henderson Decl. Ex. 4. Walker also concedes that she communicated with her husband when she would be taking sick leave from work. Narus Decl., Ex. 3, 15:15-20.

## C.    Plaintiff's Separation from B&B Print and Subsequent Job Search

In July 2018, an employee complained that plaintiff made an off-hand comment threatening to kill an employee. Apparently, an employee had placed a pallet in an area of the bindery department that plaintiff did not approve of, and he stated, "The next [expletive] who puts a pallet here is going to [expletive] die." Henderson Decl., Ex. 5. On September 23, 2016, tensions erupted between plaintiff and other B&B Print employees. Michelle Lazoff reported that plaintiff screamed at and threatened her and she found out that another employee had been yelled at as well. Henderson Decl., Ex. 6. When plaintiff was confronted about his unacceptable behavior, he resigned his employment with B&B Print. Henderson Decl., ¶ 11.

Following his separation from B&B Print, plaintiff continued to identify himself as a supervisor. His subsequent application for employment with Portland Bindery, Inc.—the first job

Page 6 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

he accepted following his resignation from B&B Print—identifies his position with B&B Print as "Bindery Supervisor." Narus Decl. Ex. 1, 98:16-99:19 and p. 19 (Depo. Ex. 9). On plaintiff's Facebook page, he lists his job title at Precision Graphics, where he worked prior to his employment with B&B Print, as "bindery supervisor." Narus Decl. Ex. 1, 83:15-84:5 and p. 14 (Depo. Ex. 4). He also indicates that at Lynx Group, Inc., a subsequent employer, his job title was "Bindery Manager." *Id.*

## IV.    DISCUSSION

### A.    The Fair Labor Standards Act and the Executive Exemption

The Fair Labor Standards Act (FLSA) ordinarily requires employers to pay their employees time and one-half for work exceeding forty hours per week. 29 U.S.C. § 207(a)(1). There are certain statutory exemptions from overtime pay requirements, including over two dozen in 29 U.S.C. § 213(b). At issue here is the exemption for individuals "employed in a bona fide * * * executive * * * capacity." 29 U.S.C. § 213(a)(1). B&B Print bears the burden of establishing that an employee fits within an exemption. "Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement." *Encino Motorcars, LLC v. Navarro*, 584 U.S. __, * 9 (2018). Previously, courts had construed the exemptions to the FLSA narrowly on the premise that the FLSA "'pursues'" its remedial purpose "'at all costs.'" *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 234 (2013) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (*per curiam*)). However, that principle of statutory construction has been set aside and courts "have no license to give the exemption anything but a fair reading." *Encino Motorcars, LLC*, 584 U.S. at *9.

Page 7 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The FLSA delegates broad authority to the Secretary of Labor to define and delimit the scope of the executive exemption; that is, whether a person is an "employee employed in a bona fide executive capacity." 29 U.S.C. § 213(a)(1). The regulations promulgated by the Department of Labor interpreting that exemption are owed deference from the Court. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Department of Labor provides that an employee qualifies for the executive exemption if:

> (1)  He or she is compensated on a salary basis at a rate not less than $450 per week;
>
> (2)  His or her "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof";
>
> (3)  He or she "customarily and regularly directs the work of two or more other employees"; and
>
> (4)  He or she "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."

29 C.F.R. § 541.100(a). There should be no dispute that plaintiff was paid on a salary basis and that his salary was sufficient to meet the threshold salary requirements set out in § 541.100(a)(1). Consequently, defendant addresses the final three factors provided in the executive exemption.

**B.  Plaintiff's primary duty was management of the bindery department.**

With respect to the primary-duties prong of the executive exemption test, the Department of Labor instructs that "primary duty" means the principal, main, major or most important duty that the employee performs and that such a determination must be based on the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. 29 C.F.R. § 541.700(a) (defining primary duty). Factors to be considered include "the relative importance of the exempt duties as compared with other types of duties; the amount of time

Page 8 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

Department of Labor regulations define "management" as including, but not limited to, the following activities: "interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among employees; determining the types of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; * * * planning and controlling the budget[.]" 29 C.F.R. § 541.102.

Further, Department of Labor regulations acknowledge that concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise met.

Although the amount of time performing exempt and non-exempt work can provide a "useful guide" for determining the primary duty of an employee, "[t]ime alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700 (b). "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.* The Department of

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Labor provides an example:

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

Indeed, courts in this district have found that an employee satisfied the primary-duty prong where he spent as little as ten percent of his time performing management duties. In *Branstetter v. Gen. Parts Distrib., LLC*, the court considered whether a Warehouse Supervisor in charge of the production department of a warehouse in Portland satisfied the executive exemption. No. 3:12-CV-02328-KI, 2013 US Dist LEXIS 178155, at *6-7 (D. Or. Dec. 19, 2013). The court noted that the plaintiff there spent about ten percent of his time supervising the employees under his direction. The rest of the time, he did manual labor, including picking parts, unloading pallets, and driving the forklift. *Id.* at *8. Nonetheless, the court found that the plaintiff's primary duty was management and was persuaded by the fact that the plaintiff apportioned work duties every morning, routinely supervised up to 12 employees, had a significant salary differential from the employees he supervised, and his employees with problems often came to him first. *Id.* at *28-29.

In reaching that conclusion, the Court found persuasive an opinion from the Fourth Circuit. There, a store manager performed nonmanagerial tasks at the store she managed when

Page 10 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

necessary and concurrently performed the managerial duties associated with running the store. *In re Family Dollar FLSA Litigation*, 637 F.3d 508, 516 (4th Cir. 2011). That is, "whether or not she happened to be putting up stock at a given moment or running a register or talking to a customer, at the same time she was responsible for making sure that the store ran successfully[,]" and "[w]hen she was doing her paperwork for her cash registers and her money, she was thinking about what had to be done later with regard to that money and all that paperwork for that and store deliveries." *Id.* at 516 (brackets and quotation omitted; brackets added). The Fourth Circuit noted, "This multi-tasking—doing management jobs while doing nonexempt work—is explicitly recognized as a managerial duty by the Department of Labor's regulations, which describe the situation where a retail manager performs concurrent nonmanagement duties[.]" *Id.* (citing 29 C.F.R. § 541.106).

Plaintiff's own testimony is that his time at work was evenly split between operating the machines in the bindery department and assisting other employees with their own tasks within in the bindery department. Narus Decl. Ex. 2 (Walker Depo, Vol. 2, 20:21-24). Moreover, he described a work environment where he had concurrent duties within the bindery department.

> Q: So if you – so it sounds like there are a couple different things that you're doing. Running machines, assisting others, and then getting the work list –
>
> A: Yeah. Yes.
>
> Q: -- or project list. What percentage would you say each of those constituted?
>
> A: Oh, I was constantly in contact with Michelle throughout the day as well as Steve and John and everybody in the shop. She'd always come through and make sure the jobs were getting done. So I didn't really have to do that as much. So I could stay busy working on the equipment.

Page 11 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

* * * * *

Q: Okay.  So would you say majority of your time was spent on actually running the machine or assisting others?

A: It was about half-and-half.

Narus Decl. Ex. 2 (Walker Depo., Vol. 2, 19:23-20:24).

Plaintiff's wife acknowledged plaintiff's role in assigning work when during her deposition.

Q: So who told you what to do every day at B&B?

A: I would go – I'd meet with Michelle, and we'd go over the list.

Q: Would she assign you to a specific machine?

A: She didn't, no.

Q: Did anybody?

A: It was usually just everybody was like, "Oh, well, this job needs to be done. I'll do that one." It all depended on who was there. I'd volunteer sometimes saying, "Oh, I can run that job on the stitcher. I'll run that one."

Q: When you didn't volunteer, how did the task get assigned to you?

A: It depended on who was working.

Q: How so?

A: Well, if Steve Wilson was – if Wayne wasn't there, Steve was there. I'd go by what Steve said. If neither one of them were there, I'd talk to Michelle. If not, I'd talk to Wayne.

Narus Decl. Ex. 3 (Marcy Walker Depo., 13:4-23).

## C.    Plaintiff customarily and regularly directed the work of two or more employees.

In 29 C.F.R. § 541.104, the Department of Labor expands on the requirement that the exempt employee "customarily and regularly directs the work of two or more other employees."

Page 12 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

First, it notes that supervisory responsibility "can be distributed among two, three or more [supervisory] employees, but each such must customarily and regularly direct the work of two or more other full-time employees or the equivalent." *Id.* For example, if there are ten nonexempt employees in a department and three exempt supervisory employees, that would satisfy this factor. Plaintiff concedes that there were five or six people in the bindery department at B&B Print. Even accounting for plaintiff's contention that he shared supervisory responsibilities with Steve Wilson, this is sufficient to satisfy the third prong of the executive exemption.

Moreover, plaintiff concedes that he had more supervisory responsibility than Steve Wilson. During deposition, plaintiff discussed the frequency with which bindery employees sought his assistance in operating bindery equipment:

> Q: When you were operating a machine in the bindery, were you able to step away from it and address issues other bindery employees might be having with their own machine or their work?
>
> A: I'd actually have to stop the machine and go help somebody.
>
> Q: And was that a fairly frequent occurrence?
>
> A: Yeah. There was lots of times where I'd help people. I'd always help people.
>
> Q: Would they seek you out to ask for help, or was it something you just saw they were having trouble and decided to go help them out?
>
> A: They'd either come to me or come to Steve. Most of the time they'd come to me because I have a little bit more experience than Steve does when it comes to bindery work.

Narus Decl. Ex. 1 (Walker Depo. 75:17-76:7).

Plaintiff also acknowledged his role in training employees in the bindery department, explaining, "I probably had the most experience, so I would be the – probably the best one to

Page 13 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

help [Kevin Walker learn how to operate the machines]." Narus Decl. Ex. 1 (Walker Depo. 29:20-30:9). When asked whether he helped employees learn how to operate the machines and run them properly, he replied, "I helped them – yeah, I help them." *Id.*

**D.     Plaintiff's recommendations for hiring and firing were given particular weight.**

Department of Labor regulations provide regarding the particular weight given to executive employee's recommendations for hiring and firing:

> To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105.

As noted, at least five individuals who are plaintiff's family members or friends of family members were hired as hourly employees in the bindery. There were no advertisements posted for those positions. Plaintiff acknowledges that he sat in on an interview with one candidate. The uncontroverted evidence is that plaintiff exercised considerable discretion in determining who would work in B&B Print's bindery department and that his recommendations were given particular weight in determining who to hire.

Page 14 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## V.    CONCLUSION

For the foregoing reasons, the court should grant summary judgment to B & B Print

Source, Inc. a/b/n of Print Source, Inc., on all of plaintiff's claims against it.

DATED this 23rd day of July, 2018.

BARRAN LIEBMAN LLP


By s/*Andrew M. Narus*
    Sean P. Ray, OSB No. 075040
    sray@barran.com
    Andrew M. Narus, OSB No. 134373
    anarus@barran.com
    Attorneys for Defendant

Page 15 – DEFENDANT'S MOTION FOR SUMMARY JUDGMENT