UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ARTHUR WAYNE WALKER, an individual,

                Plaintiff,

     v.

B & B PRINT SOURCE, INC. a/b/n of PRINT
SOURCE, INC. an Oregon Domestic business
corporation,

                Defendant.

Case No. 3:17-cv-01159-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

Plaintiff Arthur Wayne Walker ("Walker") filed this lawsuit against his former employer,
B & B Print Source, Inc. ("B & B Print"). Walker brings two claims for wage and hour
violations: overtime compensation and failure to timely pay wages due and owing upon
termination of employment violations, under the Fair Labor Standards Act ("FLSA"), 29 U.S.C.
§§ 207, 216(b) *et al*, and state law under Oregon Revised Statute ("ORS") §§ 652.140, 652.150,
653.261. Currently before the court is B & B Print's motion for summary judgment. The court
finds B & B Print has failed to establish the absence of a genuine issue of material fact that

PAGE 1 – OPINION AND ORDER

Walker qualified for the executive employee exemption under the FLSA. Therefore, B & B Print's motion for summary judgment is DENIED.

*Background*

B & B Print, a printing company, hired Walker as a bindery operator in their bindery department on April 2, 2007. [1] (Def. Mot. Summ. J., ECF No. 32 ("Def. Mot."), at 3.) When Walker was hired he was paid on an hourly basis at a rate of $24 per hour. (Narus Decl., ECF No. 33, Ex. 4, at 5.) In March of 2009, Walker was promoted from stitcher operator to bindery manager. (Def. Answer and Affirmative Defenses, ECF No. 14 ("Def. Answer"), ¶ 5.) In April of 2009, B & B Print changed Walker's compensation from an hourly rate to salary. (Def. Answer ¶ 5.) By 2015, Walker earned $91,332.50 annually. (Henderson Decl., ECF No. 34, Ex. 3.) Walker remained a salaried employee until he ended his employment with B & B Print in 2016. (Compl., ECF No. 1, ¶ 7.)

The bindery department contains various machines to assist in "doing prep work and finishing work," but the bindery department does not conduct the actual printing for the company. (Walker Dep. 18:21–23.) As a bindery operator, Walker's duties included running the bindery machines, as well as helping other employees when they struggled to a keep a machine running. (Walker Dep. 75:9–25.) During Walker's employment, the bindery department consisted of five or six employees. (Walker Dep. 21:2–3.) Of the employees in the bindery department, Walker had the most experience in bindery work, and he was the only employee in the department during that time paid on a salary basis. (Walker Dep. 76:4–7.) The second most

---

[1] In its Reply in Support of Summary Judgment, B & B Print objected to numerous portions of Arthur Walker and Marcy Walker's depositions. B & B Print asserted that the deposition excerpts referenced in Walker's Response to the Motion for Summary Judgment were not accompanied by excerpts from the official deposition transcript. The court granted Walker's motion to amend, and Walker cured this defect.

experienced employee at B & B Print was Steve Wilson, who earned $22.50 per hour. (Henderson Decl. ¶ 7); (Walker Dep. 76:4–7.)

Every morning, Michelle Lazoff, B & B Print's production manager provided the bindery department with a list of jobs to be completed over a series of days. (Def. Answer ¶ 6.) The parties dispute whether Walker then assigned the other employees in the department work according to the list, or whether the employees worked out amongst themselves who would run each machine.

In his role as bindery manager, Walker did not directly hire or fire any employees. Though Walker did not directly hire any employees on his own, Walker did recommend B & B Print hire approximately nine people, all of whom were subsequently hired. (G. Lazoff Decl., ECF No. 41, ¶ 3.) Additionally, on one occasion, Walker assisted with an employee interview. (Walker Dep. 24:12–13.) Finally, Walker's duties included signing vacation requests for bindery employees. (Henderson Decl. Ex. 4.)

*Legal Standard*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016). However, a mere "scintilla" of evidence will not overcome summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Rather, to defeat summary judgment, the non-moving party must identify facts beyond the allegations in the complaint, that show a genuine issue for trial. *Celotex*, 477 U.S. at 324. If a rational trier of fact, considering the record as a whole, could not

PAGE 3 – OPINION AND ORDER

find for the non-moving party, there is no genuine issue for trial and summary judgment should be granted. *See Liberty Lobby*, 477 U.S. at 248.

*Discussion*

B & B Print moves for summary judgment on Walker's claims for overtime compensation under federal and state law. B & B Print contends that Walker is not entitled to overtime compensation because he worked in an "executive" capacity under the FLSA. Walker opposes the motion arguing that his job duties did not meet the executive exemption test of the FLSA. For the reasons set forth below, the court denies B & B Print's motion for summary judgment.

I.    FLSA

The FLSA creates a private cause of action for an employee to recover unpaid overtime wages and back pay against his employer, if the employee is not paid the statutory wage. *Flores v. City of San Gabriel*, 824 F.3d 890, 895 (9th Cir. 2016). The FLSA requires that employers pay their employees time and one-half for any work exceeding 40 hours per week. 29 U.S.C. § 207(a)(1). However, employees who are employed in executive, administrative, or professional capacities are exempt from overtime pay. *See* 29 U.S.C. § 213(a)(1).

The FLSA does not define the term "executive" for purposes of the exemption, but the statute directs the Department of Labor ("DOL") to do so by regulation. *See* 29 U.S.C. § 213(a)(1). DOL regulations provide a four-prong test to determine whether an employee is "employed in a bona fide executive capacity." 29 C.F.R. § 541.100. To qualify for the executive employee exemption, an employee: (1) must be compensated on a salary basis at a rate no less than $455 per week; (2) must be in a role where their primary duty is managing the enterprise, or managing a customarily recognized department or subdivisions of the enterprise; (3) must customarily and regularly direct the work of at least two or more other full-time

PAGE 4 – OPINION AND ORDER

employees; and (4) must have the authority to hire or fire other employees, or the employee's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees must be given particular weight. 29 C.F.R. § 541.100(a). The employer bears the burden of proving that the employee "plainly and unmistakably" fits within the claimed exemption. *Serv. Employees Int'l Union, Local 102 v. Cty. of San Diego*, 60 F.3d 1346, 1350 (9th Cir. 1994). Thus, the court examines whether Walker satisfies all four prongs of the executive exemption test.

     *A.    Walker Satisfies the Salary Basis Test*

The parties do not dispute that Walker was paid on a salary basis and in 2015, earned an annual salary of $91,332.50. (Henderson Decl. Ex. 3.) Walker's salary satisfies the compensation prong of the exemption.

     *B.    Primary Duty*

B & B Print argues that Walker's primary duty was management. DOL Regulations describe "management" to include the following activities:

> (1) Interviewing, selecting, and training of employees; (2) setting and adjusting their rates of pay and hours of work; (3) directing the work of employees; (4) maintaining production of sales records for use in supervision or control; (5) appraising employee's productivity and efficiency for the purpose of recommending promotions or other changes in status; (6) handling employee complaints and grievances; (7) disciplining employees; (8) planning the work; (9) determining the techniques to be used; (10) apportioning the work among the employees; (11) determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; (12) controlling the flow and distribution of materials or merchandise and supplies; (13) providing for the safety and security of the employees or the property; (14) planning and controlling the budget; and (15) monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

PAGE 5 – OPINION AND ORDER

An employee's "primary duty" is defined as the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The court considers the following factors to determine whether management is an employee's primary duty:

> [T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*

1.    relative importance of the exempt duties compared with other duties

To measure the relative importance of an employee's exempt duties as compared to their other duties, courts focus on the employee's "principal value" to the company. *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) (applying the pre-2004 amended regulations test for "relative importance of exempt duties"); *see also Blake v. Classic Alaska Trading/Big Ray's Alaska, Inc.*, No. 4:16-cv-00005-SLG, 4:16-cv-00014-SLG, 2018 WL 4095727, at *10 (D. Alaska Aug., 27, 2018) (analyzing "relative importance of exempt duties" under current regulations by focusing on the employees "principal value"; test remained unchanged in new regulations). Here, the court considers whether the evidence suggests "that the performance of plaintiff's management duties was relatively more important than his performance of non-exempt duties." *Boyce v. Indep. Brewers United Corp.*, No. 15-cv-02263-YGR, 2017 WL 2377107, at *14 (N.D. Cal. June 1, 2017).

B & B Print contends that the bindery department would not have operated successfully without Walker's performance of managerial tasks. B & B Print argues "that bindery employees would seek [Walker] out for instructions in operating their equipment." (Reply Supp. Def. Mot. Summ. J., ECF No. 38, at 8.) Additionally, B & B Print highlights that Walker participated in at least one employee interview, and "personally brought in and hired at least nine employees at B

PAGE 6 – OPINION AND ORDER

& B without assistance of any other management personnel." (G. Lazoff Decl., ¶ 3.) Further, B & B Print maintains that Walker signed vacation request forms for the other employees in the bindery department, an activity that can be classified as management. (Henderson Decl. Ex. 4.)

However, the record reveals that the nature and extent of Walker's authority is disputed. Walker participated in only one employee interview. (Walker Dep. 24:10–13.) And, Walker recommended several people be hired, who were subsequently hired, but Walker contends that he did not have the final say on whether an employee was hired. (Walker Dep. 24:8–9); (Pl. Resp. to Def. Mot. Summ. J., ECF No. 36 ("Pl. Resp"), at 16) (stating that although Walker provided "positive recommendations, he had no other involvement in the hiring process") Moreover, contrary to B & B Print's contention, Walker was not the only person in the department who could sign vacation requests; Steve Wilson also periodically signed employee vacation requests. (Walker Dep. 59:1–3.)

Regardless of the existing disputes surrounding Walker's hiring recommendations, participation in an employee interview, or signing of vacation requests, the court is not convinced these managerial tasks were "of principal value" to the operation of the bindery department in comparison to Walker's other non-exempt duties. The record shows that the few undisputed managerial duties Walker performed could be, and occasionally were, handled by other employees. Walker's main asset to B & B Print was not his performance of managerial duties, but his experience and skills in operating bindery machinery. When asked why he thought he was paid more than other bindery employees, Walker responded, "I probably had the most experience. I've been doing this stuff for 35 years." (Walker Dep. 83:5–6.) The minimal value of Walker's managerial duties compared to his non-exempt duties is further evidenced by the fact that despite receiving a pay raise and having his title changed to "manager," Walker's

PAGE 7 – OPINION AND ORDER

job duties remained the same and he never received any additional managerial responsibilities. (Walker Dep. 18:5–9.)

###### 2.    amount of time spent performing exempt work

In determining whether an employee's primary duty was management, the court may consider the amount of time an employee spends performing management activities versus non-exempt activities. *See Gonzales v. City of Albuquerque*, 849 F. Supp. 2d 1123, 1187 (D.N.M. 2011) (stating that "[t]he amount of time the employee spends performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee"). Under the regulations, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," but there is no requirement that "exempt employees [must] spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b). Time alone is not a determinative factor. *See Blake v. Classic Alaska Trading/Big Ray's Alaska, Inc.*, No. 4:16-cv-00005-SLG, 4:16-CV-00014-SLG, 2018 WL 4095727, at *1 (D. Alaska Aug. 27, 2018) (upholding exempt classification for an employee whose non-exempt tasks made up 90 percent of her time). In fact, most courts give little weight to the percentage of time spent between the two types of work, as long as there are sufficient facts demonstrating that the employee's primary duty was management. *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1114 (9th Cir. 2001) (noting that "although the percentage of time spent on nonexempt tasks is relevant, it is not alone dispositive"); *see also Marzuq v. Cadete Enter's Inc.*, 807 F.3d 431, 436 (1st Cir. 2015) (stating "that an employee's 'primary' duty is not determined solely by the amount of time he or she devotes to the different categories of tasks — i.e., exempt vs. nonexempt — but on the overall character of his or her position").

B & B Print argues that because Walker spent 50 percent of his time on exempt activities and 50 percent of his time performing non-exempt activities, he satisfies the primary duty prong.

PAGE 8 – OPINION AND ORDER

B & B Print contends that courts in this district have found an employee can satisfy the primary duty prong where he spent as little as 10 percent of his time on management duties. *Branstetter v. Gen. Parts Distribution, LLC*, No. 3:12-CV-02328-KI, 2013 WL 6780672 (D. Or. Dec. 19, 2013). In *Branstetter*, the plaintiff ("Branstetter") worked as a warehouse supervisor for General Parts. *Id.* at *2. Even though Branstetter only spent about 10 percent of his time performing management duties, and the other 90 percent performing the same non-exempt work as the "employees he supervised, such as picking parts," the court still found General Parts met their burden of establishing that Branstetter qualified for the executive exemption. *Id.* at *10. The court found that the Branstetter's primary duty was management in part because of the types of management activities he performed, namely "apportioning the work of employees, providing for the safety and security of employees and the property, controlling the flow of materials, and attending management meetings." *Id.* The court noted the "most important factors [were] Branstetter's apportionment of work duties each morning, the number of employees he routinely supervised, the salary differential, and the fact that the employees with problems came to him first." *Id.* at *11.

Unlike *Branstetter*, the parties in this case dispute whether Walker was the one who apportioned work to employees each morning. Walker contends that production manager, Michelle Lazoff, created a list of jobs to be completed each day. (Walker Dep. 27:1–14.) Walker also contests whether he supervised other bindery employees, and likewise contends that other employees also regularly went to Steve Wilson when problems arose. (Pl. Resp. at 5.) Although Walker admitted in his deposition that he spends about half his time running a machine and half assisting others with their machines, he argues that "[m]erely assisting other less-experienced employees does not necessarily equate to managerial work." (Pl. Resp. at 10);

(Walker Dep., Vol. 2, 20:24.) Without a copy of Walker's job description or other evidence to suggest that the manner in which Walker helped other employees, constituted supervising or directing work, the court concludes there is a genuine dispute of material fact as to whether Walker's duties satisfy this prong of the executive exemption.

### 3. the employee's relative freedom from direct supervision

Genuine issues of material fact exist as to whether Walker satisfies the third factor, relative freedom from direct supervision. In *Blake v. Classic Alaska Trading*, the court assessed this factor by looking at whether the plaintiff "was accorded a substantial amount of discretion in discharging her managerial duties." No. 4:16-cv-00005-SLG, No. 4:16-cv-00014-SLG, 2018 WL 4095727, at *11 (D. Alaska Aug. 27, 2018). The court determined that because her "decisions to hire and fire employees did not require the approval of any other managers or the company's owners," the plaintiff "enjoyed relative freedom from supervision." *Id.*

Here, the parties disagree on whether Walker was afforded significant discretion and was free from direct supervision. Walker claims that he and the "other bindery employees worked under Michelle Lazoff's direct supervision." (Pl. Resp. at 15.) As the production manager, Lazoff was in charge of creating a list of jobs to be completed and giving that list to the bindery employees. (Pl. Resp. at 15.) Walker reports that she was "constantly in contact" with him and other employees like Steve Wilson and John Wilson, to make sure jobs were getting completed. (Pl. Resp. at 15); (Walker Dep. Vol. 2, 20:6–11.) Additionally, Walker contends that apart from small purchases, Walker did not have the authority to buy supplies or materials and had to request them through the general manager. (Pl. Resp. at 16.) Finally, Walker argues he did not have the authority to hire or fire employees on his own. (Pl. Resp. at 21.)

Although B & B Print acknowledges that Lazoff "provid[ed] Walker with a list of jobs that needed to be accomplished over the coming days," it denies that Lazoff determined how the

PAGE 10 – OPINION AND ORDER

work was to be performed or that she told Walker in what order to complete the jobs. (Def. Answer ¶ 6.) B & B Print maintains that "Walker exercise[ed] independent judgment about which order to complete the jobs," and that it "was one of Walker's responsibilities to assign the different tasks" to the bindery employees. (Def. Answer ¶ 6.) Given the material fact disputes, the court cannot conclude that this factor weighs in favor of the executive exemption.

> 4.    relationship between the employee's salary and the wages paid to other employees

Finally, the court considers the relationship between Walker's salary and the wages paid to other employees. It is undisputed that B & B Print paid Walker significantly more than any of his bindery department counterparts, thus satisfying this factor. Among the bindery employees, Walker was the only employee paid on a salary basis and he earned $91,332.50 in 2015 (Henderson Decl. Ex. 3), far more than Steve Wilson, whose job duties were most comparable to Walker and who earned an hourly wage of $22.50 per hour. (Henderson Decl. ¶ 7.) Factual disputes remain on the other three factors of the primary duties test.

Weighing all four factors in the light most favorable to Walker, the court finds there is a genuine issue of material fact as to whether Walker's primary duty was management.

### C.    *Customarily and Regularly Direct the Work of Two or More Employees*

A factual dispute exists as to whether Walker customarily and regularly supervised the work of two or more employees. According to the regulations, "'[c]ustomarily and regularly' means a frequency that must be greater than occasional but . . . , may be less than constant." 29 C.F.R. § 541.701. And, "[t]he phrase 'two or more other employees' means two full-time employees or their equivalent." 29 C.F.R. § 541.104(a).

Walker does not dispute that there were at least two full-time employees in the bindery department. Rather, Walker disputes that he customarily and regularly directed their work.

PAGE 11 – OPINION AND ORDER

Walker agrees that he regularly assisted employees in running their machines but disagrees that helping them amounted to directing their work.

B & B Print counters that Walker routinely directed the work of other employees. First, B & B Print points to Walker's deposition testimony in which he admitted to instructing employees in other departments to bring any problems within the bindery department to him. (Reply Supp. Def. Mot. Summ. J. at 6.) (citing Walker Dep. 69:16–70:6.) Second, B & B Print argues that Walker's own characterization of the bindery department is telling of his role within the department. Walker stated, "I always said [the bindery department is] ours. Steve and I always were – we were always running that bindery. We were always making sure it was running smoothly or tying to make it run smoothly." (Reply Supp. Def. Mot. Summ. J. at 7) (quoting Walker Dep. 39:22–25.) Finally, B & B Print also supplied a declaration from Steve Wilson stating that if "Wayne Walker was at work, no one but Wayne Walker told bindery department employees what to do." (Wilson Decl., ECF No. 40, ¶ 6.) Given, the differences in the parties' articulation of Walker's supervisory relationship with the other employees, the court finds a disputed issue of fact as to whether Walker customarily and regularly directed the work of two or more employees.

### D.    Authority to Hire and Fire or Recommend

The parties dispute whether Walker's hiring or firing recommendations were given "particular weight." To determine whether recommendations are given "particular weight," the court considers factors such as: "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Furthermore, "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight'

PAGE 12 – OPINION AND ORDER

even if a higher-level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status. *Id.*

There is no evidence that making hiring or firing recommendations was part of Walker's job duties. Nonetheless, it is undisputed that Walker recommended four family members, and five other people for employment at B & B Print, and that all were hired. (Lazoff Decl. at ¶ 3.) However, when it came to recommendations for termination, B & B Print agrees that only one of Walker's termination recommendations was ever followed. (Reply Supp. Def. Mot. Summ. J. at 10.) Fact disputes exist on this factor, and summary judgment is not appropriate.

II.    State Law Claims

The court reaches the same conclusion with respect to Walker's overtime pay claims under Oregon law, "which in relevant respects [are] modeled on the FLSA." *Dinicola v. State, Dept. of Revenue*, 246 Or. App. 526, 544, 268 P.3d 632, 642 (2011); *see also Whitlock v. Am. Family Mut. Ins. Co.*, No. 3:14-cv-01189-ST, 2016 WL 199420, at *3 (D. Or. Jan. 15, 2016).

Therefore, viewing the record in the light most favorable to Walker, a reasonable factfinder could conclude that B & B Print failed to meet their burden of showing that Walker falls within the executive exemption of the FLSA's overtime pay requirement. Accordingly, the court concludes that B & B Print's motion for summary judgment on Walker's parallel state law claims also must be denied.

////

////

////

////

////

////

PAGE 13 – OPINION AND ORDER

*Conclusion*

For the reasons explained above, B & B Print's motion for summary judgment (ECF No. 50) is DENIED.

IT IS SO ORDERED.

DATED this _____ day of April, 2019.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 14 – OPINION AND ORDER